# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

KERRY WOLONGEVICZ,

               Plaintiff,

v.                                            5:17-cv-933(BKS/DEP)

TOWN OF MANLIUS; MANLIUS POLICE DEPARTMENT;
VILLAGE OF MANLIUS; MANLIUS FIRE DEPARTMENT;
CAPTAIN KEVIN SCHAFER; CHIEF PINSKY; CHIEF OF
POLICE FRANCIS MARLOW; INVESTIGATOR JAMES
GALLUP; OFFICER ROSS CARNIE; CAPTAIN JEFF
PECKINS; SGT. CHRISTOPHER CUSHMAN; BENJAMIN
SCHMID; JOHN DOE(S) and JANE DOE(S),

               Defendants.

_____

**Appearances:**

A.J. Bosman
Bosman Law Firm, L.L.C.
201 West Court Street
Rome, New York 13440
*For Plaintiff Kerry Wolongevicz*

Sarah A. Hansen
Burden, Hafner & Hansen, LLC
605 Brisbane Building
403 Main Street
Buffalo, New York 14203
*For Defendants Town of Manlius, Manlius Police Department, Captain Kevin Schafer, Chief of Police Francis Marlowe, Investigator James Gallup, Officer Ross Carnie, Captain Jeff Peckins, and Sgt. Christopher Cushman*

David H. Walsh, IV
Barth Sullivan Behr
224 Harrison Street, Suite 208
Syracuse, New York 13202
*For Defendant Village of Manlius*

Jacqueline Phipps Polito
Abigail L. Giarrusso
Littler Mendelson, P.C.
375 Woodcliff Drive, 2nd Floor
Fairport, New York 14450
*For Defendants Manlius Fire Department, Chief Pinsky, and Benjamin Schmid*

**Hon. Brenda K. Sannes, United States District Judge:**

## AMENDED[1] MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Kerry Wolongevicz, a former police officer for the Manlius Police Department ("MPD"), brings this action alleging employment discrimination claims and state tort claims against Defendants Town of Manlius, MPD, Captain Kevin Schafer, Chief of Police Francis Marlowe, Investigator James Gallup, Officer Ross Carnie, Captain Jeff Peckins, and Sgt. Christopher Cushman ("Town Defendants"), Defendant Village of Manlius ("Village Defendant"), Defendants Manlius Fire Department, Chief Pinsky, and Benjamin Schmid ("Fire Department Defendants"), and Defendants John and Jane Does. Plaintiff alleges that Defendants subjected her to: a hostile work environment, disparate treatment, discrimination, and retaliation, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 – 301  (First–Third Causes of Action); a hostile work environment and disparate treatment, in violation of the Equal Protection Clause of the Fourteenth Amendment (Fourth and Fifth Causes of Action); retaliation in violation of the First Amendment (Sixth Cause of Action); defamation, intentional infliction of emotional distress, tortious interference, and prima facie tort, in violation of New York law (Seventh–Tenth Causes of Action); and discrimination, a hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

[1] This Memorandum-Decision and Order is amended solely to change the date in Section V.I., *infra*, from August 24, 2018 to August 31, 2018.

2

§§ 2000e–2000e-17 ("Title VII") (Eleventh–Thirteenth Causes of Action). (Dkt. No. 4). The Town Defendants have asserted a cross-claim for indemnification and contribution against the Village Defendant, Fire Department Defendants, and John and Jane Doe Defendants. (Dkt. No. 12, ¶ 89; Dkt. No. 17, ¶ 89).

Presently before the Court are the following motions: (1) the Village Defendant's motion to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 13); (2) the Fire Department Defendants' motion to dismiss the Amended Complaint and the Town Defendants' cross-claim (Dkt. No. 14; Dkt. No. 22); (3) the Town Defendants' motion to dismiss the Seventh, Eighth, Ninth, and Tenth Causes of Action (Dkt. No. 18); and Plaintiff's cross-motion to amend the Amended Complaint under Rule 15 (Dkt. No. 23). For the reasons that follow, other than the Defendant Village's motion to dismiss, which is granted, the parties' motions are granted in part and denied in part.

## II.    CROSS-MOTION TO AMEND

With her cross-motion to amend, Plaintiff has submitted a proposed "Second Amended Complaint" ("PSAC") (Dkt. No. 23-4), which she contends will "clarify and amplify, with additional factual support, existing causes of action." (Dkt. No. 23-5, at 4). Defendants argue that the proposed amendments are futile. (Dkt. Nos. 26–28). In general, leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Where plaintiffs seek to amend their complaint while a motion to dismiss is pending, a court 'has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint.'" *Haag v. MVP Health Care*, 866 F. Supp. 2d 137, 140 (N.D.N.Y. 2012) (quoting *Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 384 (D. Conn. 2008)). Since Defendants have had a full opportunity to

respond to the proposed amendments, Plaintiff does not seek to add new defendants, and the primary claims remain the same, the merits of the motion to dismiss will be considered in light of the PSAC. If the claims in the PSAC cannot survive the motion to dismiss, then Plaintiffs' cross-motion to amend will be denied as futile. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6).").

## III.   BACKGROUND[2]

Plaintiff was employed as a MPD police officer from 2008 until 2016. (Dkt. No. 23-4, ¶¶ 4, 32–38). Throughout her employment, Plaintiff, a female officer, was held "to higher standards" and subjected to greater "scrutiny while . . . male officers [were allowed] to evade discipline or criticism." (*Id*., ¶ 14). As detailed below, many of the individual Defendants in this case exposed her to sexually explicit discussions between male officers[3] and made degrading remarks to her based on her gender. (*Id*.). Despite her complaints, she received no protection from her supervisors. (*Id*.).

### A.   MPD Investigator James Gallup

In November 2013, while in firearms training, Defendant Gallup, "a white male, made derogatory comments about Plaintiff being a police officer," and "made derogatory statements about females, including comments regarding the female anatomy." (*Id*. ¶ 15). During the

---

[2] The facts are taken from the PSAC and assumed to be true for the purposes of this decision. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[3] The majority of the allegations in the PSAC concern individuals who are named as Defendants. There are, however, allegations concerning Leo Capria, a former MPD police officer who retired in 2013 and who is not a defendant in this case, that the Court summarizes here to the extent they form part of the alleged hostile work environment. Plaintiff alleges that Capria, a white male officer, "placed his testicles on communal food which Plaintiff consumed and after which she was laughed at and advised to 'next time check for pubic hair.'" (Dkt. No. 23-4, ¶ 19). Additionally, Capria "received a 'training memo' for stating that a female citizen motorist 'needed to be ass fucked' while a ride-along juvenile was in the patrol car," and shared the memo with Plaintiff during a training session and reiterated the offensive statement. (*Id*. ¶ 20). Capria also "bragged about having affairs with women while on duty in patrol cars." (*Id*.).

training, Defendant Gallup "stated that he had recently 'fucked' a drunk Le Moyne College 'chick,'" who "was so drunk she had no idea what was going on." (*Id*.). Also during the firearms training, Defendant Gallup "stated he was going to pull his dick out"; a coworker responded that "Plaintiff should pull 'her dick out too.'" (*Id*.).

Plaintiff made a complaint detailing this incident to her supervisors and told them that it had caused her distress. (*Id*. ¶ 16). One of the supervisors gave Plaintiff "an EAP card (employee assistance program) to contact for support." (*Id*.). Plaintiff left work early and the EAP program referred her "to a therapist who met with her regularly for approximately one year due to work environment-related stress." (*Id*.).

Subsequently, Defendant Marlowe, Chief of MPD, informed Plaintiff that her complaint had been investigated, that Defendant Gallup "had received a 'training memo,' rather than discipline" and that his discipline would be "progressive."[4] (*Id*. ¶ 17). When Plaintiff asked Defendant Marlowe whether "someone had contacted Le Moyne College to check for any reports of rape," he responded no. (*Id*.). Plaintiff was not satisfied with "the investigation or the meagerness of Officer Gallup's penalty" and asked Defendant Marlowe if she could talk to the town supervisor. (*Id*.). "Chief Marlowe angrily instructed Plaintiff not to talk to the town supervisor" and told her "that if she spoke to anyone about the matter, including friends or other officers, that she would be the one disciplined." (*Id*.). Defendant Marlowe "chastised" Plaintiff for reporting the incident "a week later" instead of immediately. (*Id*.). Plaintiff concluded based on Defendant Marlowe's response that her "complaint was unwelcome and ill-advised." (*Id*.). Plaintiff alleges "[o]n information and belief, other women at [MPD] have complained about Officer Gallup's conduct before and after this time and those complaints were dismissed as

---

[4] According to the PSAC, the Town Defendants "were aware at the time that Officer Gallup was under military investigation regarding a betting ring about female soldiers in his unit." (Dkt. No. 23-4, ¶ 17).

'personality conflict.'" (*Id.*). Defendant Gallup refused to speak with Plaintiff after her complaint "and openly disrespected her and her presence without consequence." (*Id.* ¶ 18). In April 2016, Defendant Gallup stated that "he was 'sick of you females walking around like you own the place.'" (*Id.* ¶ 18).

### B. MPD Officer Ross Carnie

In 2014, "Plaintiff briefly dated a fellow officer," Defendant Carnie. (*Id.* ¶ 30). After their relationship ended, Defendant Carnie engaged "in open and notorious resentful and hostile treatment of Plaintiff." (*Id.*). Plaintiff, who "was almost never chosen" to attend training schools, had been scheduled to attend a general topics school in May 2016. (*Id.*). Defendant Carnie "complained during role [sic] call" about Plaintiff's selection to attend the school and insulted Plaintiff, asking "You? Why would they send you?" and stating "maybe they are hoping you'll learn something." (*Id.*).

### C. MPD Sergeant Christopher Cushman

In Fall 2014, Defendant Cushman, a white male MPD officer, was promoted to sergeant. (*Id.* ¶ 22). Defendant Cushman

> made statements in front of Plaintiff multiple times stating, in sum and substance, that his wife "wasn't fucking him so he had to get it somewhere else as long he found the right woman who wouldn't say anything about it." Additionally, he made multiple statements about a Turkish prison he purportedly visited while on military deployment where women were imprisoned to pay off their husbands [sic] debts as prostitutes. Sgt. Cushman often talked about his visits there and how fun it was to pick the woman he wanted to have sex with. Further, he would discuss renting an apartment to carry on an affair and represented that he falsified a letter reflecting that he was to be deployed so that he could get out of the remainder of the lease when the affair ended.

(Dkt. No. 23-4, ¶ 22). Following his promotion, Defendant Cushman advised other officers that "Plaintiff was 'trouble'" and told them "not to associate or meet up with her." (*Id.* ¶ 23). "In roll

call he wouldn't acknowledge or look at Plaintiff and would only talk to the male officers." (*Id.*). "At one point," Defendant Cushman "told Plaintiff to 'find another fucking job' and yelled at Plaintiff, hanging up on her when she called him with questions regarding a call." (*Id.*).

The next day, Plaintiff reported "the incident" to Defendant Peckins, a lieutenant at the MPD, and gave him a memo[5] regarding "the issues with" Defendant Cushman. (*Id.* ¶ 24). Defendant Peckins told her that Defendant Cushman "had made a complaint about her the night before purportedly because she went to another supervisor . . . regarding an extension with a report." (*Id.*). Defendant Cushman's complaint, however "was a complete fabrication as Plaintiff had never done such a thing." (*Id.*). Although Defendant Peckins investigated Defendant Cushman's complaint and deemed it "to be unfounded and untrue," Defendant Cushman was "not disciplined for this lie." (*Id.*). In contrast, Plaintiff was "admonished to 'communicate better' even though [she] had done nothing wrong." (*Id.*).

Defendant Peckins "and others conducted an internal affairs investigation regarding Plaintiff's memo." (*Id.* ¶ 25). Following the investigation, Defendants Marlowe, Schafer, and Peckins advised Plaintiff "that the issues with Sgt. Cushman had been addressed" and when Plaintiff "expressed concern for [her] well being as she was working directly under" Defendant Cushman, Defendants Marlowe and Peckins responded they "would 'keep an eye' on it." (*Id.*).

"Several days later," Defendant Cushman "retaliated and told Plaintiff's fellow officers to be careful around her as she had gotten him written up." (*Id.* ¶ 25). Although Plaintiff had been ordered not to discuss her complaint regarding Defendant Gallup with anyone, Defendant Peckins dismissed reports of Defendant Cushman's discussion of Plaintiff's complaint and "claimed they could not prevent him from talking about it." (*Id.*).

---

[5] "Officers Beth Brainard and Angela Palmer also wrote memos regarding their own poor and harassing experiences" with Defendant Cushman. (Dkt. No. 23-4, ¶ 25).

Two weeks later, Plaintiff had to abandon her pursuit of a "reckless motorcyclist" after Defendant Cushman "failed to provide critical backup." (*Id*. ¶ 26). Defendants Cushman and Peckins "conspired" "to make Plaintiff believe a 'citizen' had called with a concern about the pursuit." (*Id*.). Plaintiff confronted Defendant Peckins and told him that "it was really Cushman as he witnessed the beginning of the pursuit" and failed to assist. (*Id*.). Defendant Peckins "admitted it was Cushman" and told Plaintiff that he reviewed the "dash cam footage" and that "she had done everything correctly and within policy." (*Id*.). When Plaintiff asked Defendant Peckins why Cushman had not assisted her "as this was a serious officer safety issue," he replied that "this is what we were worried about with you working with him after everything, we will keep an eye on it." (*Id*.). Defendant Cushman "bragged to others . . . that he had reported Plaintiff's pursuit" but was not disciplined "for his lack of assistance or unprofessional discriminatory and retaliatory conduct."[6] (*Id*.).

In April 2016, a female officer from Cicero, New York, applied for a position at the MPD. (*Id*. ¶ 29). When Defendant Cushman "learned of her application, he called three Cicero Officers, asked "what does that broad think she's doing applying to my department? Is she stupid?" and told them to "'Get the dirt on her' so that she wouldn't be hired." (*Id*.). Defendant Cushman "then sought to instigate rumors about [the female applicant] to prevent her from being hired." (*Id*.). The female applicant was not hired "because of rumors." (*Id*.).

On May 1 or 2, 2016, Defendant Cushman "asked everyone to write memos complaining about Plaintiff." (*Id*. ¶ 28). At least one officer "stated that he did not want to write the memo but

---

[6] Plaintiff contends that Defendant Cushman's "preferential treatment as a male is in stark contrast to the exacting expectations of Plaintiff as a result of her gender and certain discipline if ever it was she who had not assisted another officer." (Dkt. No. 23-4, ¶ 26).

felt he had to because Sgt. Cushman was his supervisor." (*Id.*).[7] "In spite of awareness that Sgt. Cushman and others would not fairly and consistently supervise Plaintiff's shift, [Defendant] Peckins only suggested changing Plaintiff's shift, endorsing Sgt. Cushman's conduct and the discriminatory and retaliatory hostile work environment." (*Id.*).

### D.      End of Employment at MPD

On May 4, 2016, Plaintiff informed the MPD that she had obtained an order of protection against Defendant Schmid, her former boyfriend and a volunteer firefighter. (*Id.* ¶ 31). It was "a complete stay-away Order, prohibiting [Schmid] from going to Plaintiff's work." (*Id.*). Schmid "had threatened to" and had made "complaints to Plaintiff's employer in an attempt to coerce Plaintiff to meet with him and/or continue the relationship, impugning Plaintiff's character." (*Id.*).

On May 6, 2016, Defendant Schafer, an MPD captain who was aware of the order of protection, told Plaintiff that Defendant Schmid "had come to the station to make complaints about her" and that he had "accused [Plaintiff] of threatening firefighters from Manlius in December 2015." (*Id.* ¶ 32). Plaintiff explained to Defendant Schafer—though he already knew—that Defendant Schmid "was angry that she had refused to talk to him and that she had obtained an order of protection." (*Id.*). When Plaintiff told Defendant Schafer that Defendant Schmid "had threatened to go to her police department and tell them she didn't secure her weapon in a safe at home if she did not talk to him," Defendant Schafer "admitted" that Defendant Schmid "had told him that." (*Id.*). When Plaintiff asked why Defendant Schmid "had not been arrested for violating the order" of protection, Defendant Schafer responded that an arrest "would not be 'entertained.'" (*Id.*). Defendant Schafer informed Plaintiff that she was "the

---

[7] Additionally, in 2015 and 2016, Defendant Cushman excluded Plaintiff from "frequent on-shift barbeques" that he hosted with her coworkers. (Dkt. No. 23-4, ¶ 27).

subject of an internal affairs investigation." (*Id*.). Plaintiff was distressed that Defendant Schafer was "treating her like a criminal and not his officer or worthy of protection as a domestic violence victim" and "felt a severe pain in her chest area and found it difficult to breathe or speak." (*Id*. ¶¶ 32–33). Defendant Schafer ordered her to remove her weapons from her belt and to place them on the desk, which she did. (*Id*. ¶ 33). Plaintiff told Defendant Schafer that she "needed to go" and left the building. (*Id*.). Defendant Schafer followed her to her truck and asked "for her keys, identification and badge which she handed to him." (*Id*.).

"Shortly thereafter," Defendants Schafer and Marlowe came to Plaintiff's home and approached Plaintiff in her front yard. (*Id*., ¶ 33). Plaintiff "stated that Schmid had violated the Order." (*Id*.). Defendant Marlowe "explained that the Internal Affairs Investigation was necessary and that there were no criminal allegations and left." (*Id*.).

At approximately 7:00 p.m. that night, Plaintiff received a call "from a male who identified himself as Manlius Fire Chief Pinsky." (*Id*. ¶ 34). Defendant Pinsky stated that he had heard from Defendant Schafer that she had resigned. (*Id.*). Defendant Pinsky asked Plaintiff "what if I told you I can make all this go away?" and attempted "to intimidate Plaintiff into dropping the order of protection against . . . Schmid." (*Id*.). Defendant Pinsky told Plaintiff "in sum and substance, that he could make the internal affairs investigation and or complaints against her 'all go away' and that 'all she needed to do' was call the DA's office and 'drop all this.'" (*Id*.). He spoke "aggressively" and threatened that "he would have his firefighters report on her" and that "he would 'file' against her brother, too." (*Id*.). Before Plaintiff hung up the phone, Defendant Pinsky stated "it's not a threat, that's what is going to happen." (*Id*.). Defendant Pinsky "also sent [Plaintiff] threatening text messages." (*Id*.).

Plaintiff then contacted Defendants Schafer and Marlowe and "advised them that Schmid was now attempting to intimidate her by third-party contact via the fire chief, Pinsky." (*Id*. ¶ 35). Defendants Schafer and Marlowe came to Plaintiff's home, where she told them "that the Order had been violated." (*Id*.). They responded that "they did not want to investigate the matter" but that Defendant Marlowe would call Defendant Pinsky "and tell him not to call [Plaintiff] anymore." (*Id*.). Defendant Schafer then asked Plaintiff to turn in her off-duty weapon, which she did. (*Id*.). Defendant Marlowe told Plaintiff to "keep in touch" and they left. (*Id*.).

At approximately 11:30 p.m., Plaintiff received a call from her supervisor at her part-time job, who asked if she was ok. (*Id*. ¶ 36). The supervisor told Plaintiff that Defendant Schafer had called him and told him that Plaintiff "had 'resigned.'" (*Id*.). "Plaintiff did not resign." (*Id*.).

The next afternoon, while Plaintiff was packing to return home to Massachusetts with her brother, a New York State Trooper "came to her home and told her . . . that Benjamin Schmid had called to make a complaint that [her brother] had texted him two weeks earlier (before the order) telling him to stay away from Plaintiff and her home." (*Id*. ¶ 37). Plaintiff told the trooper "what had occurred the day before at her workplace." (*Id*.). "Over the next few days Plaintiff received several phone calls from the NYS Troopers to advise that firefighters had come in to report that she had been acting in a threatening manner in December, 2015 at the Manlius fire station." (*Id*.). The New York State Troopers investigated the matter and "found no evidence that these allegations were true" and "[i]nformed Plaintiff . . . that Chief Pinsky's conduct may have constituted intimidation of a witness." (*Id*.).

Subsequently, Plaintiff was treated at a Massachusetts hospital for "severe stress." (*Id*. ¶ 38). The following Saturday, when Plaintiff called Defendant Marlowe "to request extended sick leave," he responded that Plaintiff "had resigned and they 'had already processed the

paperwork and the attorney had already filed it,'" and that Plaintiff should "'stay in touch.'"
(*Id*.).

On June 17, 2016, Plaintiff filed a claim for workers compensation benefits under New York General Municipal Law 207-c alleging that her medical leave "arose from 'incidents from the past three years involving sexual harassment.'" (*Id*. ¶ 38). Plaintiff alleges that because her "injury is work related" the Town Defendants wrongfully "refused to process or provide Plaintiff . . . benefits to which she is entitled" and "controverted [her] worker's compensation claim without a good faith basis to do so." (*Id*.). "On or about October 31, 2016, Plaintiff's employment with the Town of Manlius was terminated on the pretextual basis that she resigned." (*Id*.).

On August 3, 2016, Plaintiff served a notice of claim on Defendants and filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id*. ¶ 10). Plaintiff's EEOC charge was cross-filed with the New York State Division of Human Rights. (*Id*.). On May 18, 2017, "the U.S. Department of Justice, Civil Rights Division issued a Notice of Right to Sue letter to Plaintiff." (*Id*. ¶ 11).

## IV.    MOTION TO DISMISS – Fed. R. Civ. P. 12(b)(5)

Defendant Pinsky seeks dismissal under Rule 12(b)(5) on the ground that Plaintiff failed "to effectuate proper service on him as an individual." (Dkt. No. 14-1, at 13). Plaintiff opposes this motion. The Court finds that Plaintiff has failed to show she served Defendant Pinsky properly, but will extend the time to allow for proper service.

### A.    Standard of Review

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v.*

*Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). "Absent consent, this means there must be authorization for service of summons on the defendant." *Id*. A court "must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). "When a defendant raises a Rule 12(b)(5) 'challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy.'" *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting *Preston v. New York*, 223 F. Supp. 2d 452, 466 (S.D.N.Y. 2002)). A plaintiff must, "through specific factual allegations and any supporting materials, make a prima facie showing that service was proper." *Kwon v. Yun*, No. 05-cv-1142, 2006 WL 416375, at *2, 2006 U.S. Dist. LEXIS 7386, at *6 (S.D.N.Y. Feb. 21, 2006).

**B.      Analysis**

Rule 4 of the Federal Rules of Civil Procedure provides that service of a summons and complaint may be effected by: (1) delivering process to the individual defendant personally; (2) leaving process at the individual defendant's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (3) delivering process to an authorized agent of the defendant, whether the defendant be an individual, corporation, partnership, or association. *See* Fed R. Civ. P. 4(e)(2), (h)(1)(B). Alternatively, Rule 4 permits service to be effected by "following state law for serving a summons in an action . . . in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1) (service on an individual); *see also* Fed. R. Civ. P. 4(h)(1)(A) (cross-referencing Rule 4(e)(1) for service on a corporation, partnership, or association).

Under New York law, the following methods may generally be used to serve process on an individual: (1) delivering the summons to the defendant personally; (2) delivering the

summons to a person of suitable age and discretion at the defendant's actual place of business, dwelling place, or usual place of abode, and mailing the summons to the defendant's last known residence or actual place of business (a procedure commonly referred to as leave-and-mail service); or (3) delivering the summons to an individual designated as the defendant's agent for service. *See* N.Y. C.P.L.R. 308(1)–(3).

Defendant Pinsky submitted a declaration stating that he is "the sole member of the law firm Pinsky Law Group, PLLC," and he is "a volunteer firefighter with the Manlius Fire Department, a department of the Village of Manlius" and is not "employed by either the Fire Department [or the] Village of Manlius." (Dkt. No. 14-4, ¶¶ 2–3). Defendant Pinsky asserts that because Plaintiff "deliver[ed] the Summons and Complaint to an on duty lieutenant with the Fire Department at one of the Fire Departments' stations and subsequently mail[ed] the Summons and Complaint to the Manlius Fire Department," neither of which were "his actual place of business or his residence," service was insufficient. (Dkt. No. 14-1, at 13). Plaintiff responds that because Chief Pinsky is a member of the Fire Department, and, under New York law, "a person can have more than one 'actual place of business' for the purposes of § 308(2)," service was proper. (Dkt. No. 23-5, at 19) (quoting *Velez v. Novartis Corp.*, No. 04-cv-9194, 2006 WL 903228, at *1, 2006 U.S. Dist. LEXIS 1758, *5 (S.D.N.Y. Apr. 5, 2006)). Plaintiff has not, however, provided the affidavit of service or offered any evidence from which the Court could find that the Fire Department, where he was a volunteer, was Defendant Pinsky's "actual place of business." Thus, she has failed to sustain her burden. *See Selmani v. City of New York*, 100 A.D.3d 861, 862 (2d Dep't 2012) (finding that the plaintiffs failed to establish the defendant "was served at his 'actual place of business' pursuant to CPLR 308(2)" as "there was no showing

that the appellant was physically present with regularity or regularly transacted business at the headquarters of the New York City Fire Department in Brooklyn where process was served").

"If a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). "[I]f the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.* Here, Plaintiff makes no attempt to show good cause. This does not end the inquiry, however, because "a district court may grant an extension in the absence of good cause." *Zapata v. City of New York*, 502 F.3d 192, 197 (2d Cir. 2007); *see DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010) ("Under Rule 4(m), the Court *must* extend the time to serve if plaintiff has shown good cause, and *may* extend the time to serve even in the absence of good cause." (citing Fed. R. Civ. P. 4(m) advisory committee's note to 1993 amendments). "Factors relevant to the exercise of this discretion include, *inter alia*, the relative prejudice to the parties (including whether the action would be barred by the statute of limitations and whether defendant had actual notice of the suit) and whether there is a 'justifiable excuse' for the failure properly to serve." *Mares v. United States*, 627 F. App'x 21, 23 (2d Cir. 2015); *see also DeLuca*, 695 F. Supp. 2d at 66 ("In determining whether a discretionary extension is appropriate in the absence of good cause, a court considers the following four factors: (1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether defendant attempted to conceal the defect in service; and (4) whether defendant would be prejudiced by extending plaintiff's time for service.").

Because there is a three-year statute of limitations for § 1983 claims, *see Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) ("[T]he limitations period for § 1983 claims is

borrowed from state law, which, in the case of New York, confers only a three-year period."), Plaintiff's § 1983 claims against Defendant Pinsky, which occurred in 2016, could be timely refiled. Plaintiff's intentional tort claims, however, are governed by a one-year statute of limitations and would be barred. *See Lawson v. Rubin*, No. 17-cv-6404, 2018 WL 2012869, at *13, 2018 U.S. Dist. LEXIS 71582, at *49 (E.D.N.Y. Apr. 29, 2018) ("New York law provides one-year limitations period for intentional torts."). Further, it is undisputed that Defendant Pinsky had actual notice of the claims in this case. Under these circumstances, the Court, in its discretion, concludes that an extension is warranted. To avoid dismissal of her claims against Defendant Pinsky, Plaintiff must, within 14 days of the date of this order, effectuate service on Defendant Pinsky and file a certificate of service. If Plaintiff fails to do so, the Court will dismiss Pinsky as a Defendant from this case.

**V.      MOTION TO DISMISS – Fed. R. Civ. P. 12(b)(6), (c)**

The Village and Fire Department Defendants move to dismiss for failure to state a claim under Rule 12(b)(6): (1) the NYSHRL claims; (2) the First and Fourteenth Amendment claims, brought under 42 U.S.C. § 1983; (3) the Title VII claims; and (4) the state common law claims. (Dkt. Nos. 13, 14). Additionally, the Fire Department Defendants move to dismiss the Town Defendants' cross-claims for indemnification and contribution. (Dkt. Nos. 14, 22). The Town Defendants move to dismiss under Rule 12(b)(6) and for judgment on the pleadings under Rule 12(c) with respect to the state common law claims. (Dkt. No. 18).

**A.      Standard of Review**

To survive a motion to dismiss under Rule 12(b)(6), for failure to state a claim, or under Rule 12(c), for judgment on the pleadings, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*,

709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) ("In deciding a Rule 12(c) motion, 'we employ[] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6).'" (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (alteration in original)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Bell*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.  Analysis

#### 1.  New York State Human Rights Law

##### a.  Defendants Pinsky and Schmid

Defendants Pinsky and Schmid argue that the NYSHRL claims against them must be dismissed because: (i) there is no allegation that they are Plaintiff's employers; and (ii) there is no allegation that they "were motivated by discriminatory or retaliatory animus." (Dkt. No. 14-1, at 20–21). Plaintiff responds that even if they are not her employers, Defendants Pinsky and Schmid may be held liable as aiders and abetters under the NYSHRL for their participation "in the discriminatory and retaliatory acts against" her. (Dkt. No. 23-5, at 8).

Section 296(6) of the NYSHRL states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article [including discrimination and retaliation], or to attempt to do so."

N.Y. Exec. Law § 296(6). The Court of Appeals of New York has stated that § 296(6) "extends liability to persons and entities beyond . . . employers, and this provision should be construed broadly." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 187 (2017); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014) ("Under New York law, a hostile work environment may give rise to statutory claims against employers and, in some circumstances, against non-employer individuals."). Thus, an individual who "'actually participates in the conduct giving rise to a discrimination claim' [may] be held liable under the NYSHRL" even if a non-employer. *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)). Accordingly the Court turns to the allegations against Defendants Pinsky and Schmid.

### i.      Hostile Work Environment

Defendants Pinsky and Schmid argue that the NYSHRL hostile work environment claim must be dismissed because there is no allegation in the PSAC that they were motivated by discriminatory or retaliatory animus. (Dkt. No. 14-1, at 21). To state a hostile work environment claim under the NYSHRL, a plaintiff must allege that "the workplace was 'permeated with discriminatory intimidation, ridicule, and insult . . . that [was] sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Pall v. Roosevelt Union Free Sch. Dist.*, 144 A.D.3d 1004, 1005 (2d Dep't 2016) (quoting *Torres v. Louzoun Enters., Inc.*, 105 A.D.3d 945, 946 (2d Dep't 2013)). Further, "[c]ourts have interpreted [the NYSHRL] to require a showing that the defendant *actually participated* in the conduct giving rise to the claim of discrimination." *Brice v. Security Operations Sys., Inc.*, No. 00-cv-2438, 2001 WL 185136, at *4, 2001 U.S. Dist. LEXIS 1856, at *10 (S.D.N.Y. Feb.26, 2001) (citing *Tomka*, 66 F.3d at 1317). "Aiding and abetting liability requires that the aider and abettor

'share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose.'" *Id.* (citing cases); *see also Edwards v. Khalil*, No. 12-cv-8442, 2016 WL 1312149, at *24, 2016 U.S. Dist. LEXIS 44407, at *81 (S.D.N.Y. Mar. 31, 2016) ("A plaintiff must also show that the aider and abettor acted with discriminatory intent."); *Hassan v. City of Ithaca*, No. 10-cv-6125, 2012 WL 1190649, at *6, 2012 U.S. Dist. LEXIS 50397, at *19 (W.D.N.Y. Apr. 9, 2012) ("The aider and abettor must also 'share the intent or purpose of the principal actor' and the plaintiff must show the 'direct [and] purposeful [] participation' of the aider and abettor to establish liability under § 296(6)." (alterations in original) (quoting *Robles v. Goddard Riverside Cmty. Ctr.*, No. 08-cv-4856, 2009 WL 1704627, at *3 (S.D.N.Y. June 17, 2009))).

Even assuming that the PSAC contained allegations sufficient to indicate that Defendants Pinsky and Schmid participated in the alleged hostile work environment at MPD, it fails to allege discriminatory animus. The PSAC alleges that Schmid complained about Plaintiff to MPD "in an attempt to coerce Plaintiff to meet with him and/or continue the relationship." (Dkt. 23-4 at ¶ 31). In her memorandum of law, Plaintiff argues that discriminatory animus may be inferred from the allegations that she is a woman who sought protection from "her abusive boyfriend" and "Defendants are men seeking to protect another man."[8] (Dkt. No. 23-5, at 8–9). These allegations, however, do not allow an inference that Defendants Pinsky and Schmid threatened her or made false reports to the MPD about her conduct because of her gender. *See*, *e.g.*, *Eng v. City of N.Y.*, 715 F. App'x 49, 52 (2d Cir. 2017) ("Plaintiff's threadbare allegations do not give rise to a plausible inference of discrimination on the basis of age or gender. Eng's only

---

[8] In the PSAC, Plaintiff also alleges that Schmid "referenced Plaintiff in a derogatory fashion implicating her gender, including repeatedly calling her a 'dumb psycho bitch' when he was personally served with the Summons and Complaint in this matter." (Dkt. No. 23-4, ¶ 39). This incident, however, occurred well after the alleged discriminatory employment actions.

allegations are that she is a 58-year old woman who is paid less than a 57-year old man, a 54-year old man, and a 41-year old woman. That alone cannot plausibly support an inference that discriminatory animus is the reason for the disparities in pay she alleges; we 'cannot infer discrimination from thin air.'" (quoting *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998))). Thus, the NYSHRL hostile work environment claim against Defendants Pinsky and Schmid are dismissed.

### ii.        Discrimination

To establish a gender discrimination claim under the NYSHRL, a plaintiff must show that she was: (1) "a member of a protected class;" (2) "qualified for her position;" (3) "subjected to an adverse employment action;" and (4) "either terminated or treated differently under circumstances giving rise to an inference of discrimination." *Askin v. Dep't of Educ.*, 110 A.D.3d 621, 622 (1st Dep't 2013). A plaintiff need not establish a *prima facie* case at the pleadings stage; "her burden is 'minimal'—[s]he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84, 87 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). Indeed, under the NYSHRL, "there can be no claim for sexual discrimination, including that based on a hostile work environment, unless the plaintiff was treated differently because of her sex." *Hernandez v. Kaisman*, 103 A.D.3d 106, 111–12 (1st Dep't 2012) (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)).

Assertions that Defendant Schmid went to the MPD and accused Plaintiff of threatening firefighters and failing to "secure her weapon in a safe at home," (Dkt. No. 23-4, ¶ 32), and that Defendant Pinsky offered to make the investigation by her employer "go away" if she dropped the order of protection and threatened that his firefighters would "report on her" and her brother

if she did not, (*id*. ¶ 34), support an inference of personal animosity; they are not, however, plausible allegations of gender-based discriminatory animus. Thus, Plaintiff's NYSHRL discrimination claims against Defendants Pinsky and Schmid are dismissed.

### iii. Retaliation

Plaintiff argues that she "was subjected to retaliatory actions by Pinsky and Schmid, both men, as a consequence of seeking and obtaining an Order of Protection." Protected activity within the meaning of the NYSHRL is conduct that "oppos[es] or complain[s] about unlawful discrimination." *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312–13 (2004); *see also* N.Y. Exec. Law § 296(7) ("It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."). There is no allegation that Plaintiff's actions in seeking or obtaining an order of protection based on incidents of domestic violence is an "activity to which [§ 296(7)] applies." *Id.*; *see Mi-Kyung Cho v. Young Bin Cafe*, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) (rejecting argument that the plaintiff's "filing of a police report concerning Kim's assault constitutes a protected activity," explaining that "[t]his complaint did not concern any conduct prohibited under . . . the NYSHRL," that "Kim's assault of plaintiff, while disturbing, simply did not relate to any employment practice—discriminatory or not—of the defendants," and that "[a]side from the fact that assault occurred while plaintiff was working at Young Bin Café, there are no facts suggesting any connection between the defendants' employment practices and this assault"). Moreover, absent protected activity, there can be no plausible inference of a retaliatory motive.

Accordingly, the NYSHRL retaliation claim as against Defendants Pinsky and Schmid, is dismissed.

### b. Village of Manlius and Manlius Fire Department

In the First, Second, and Third Causes of Action, Plaintiff alleges that Defendant Village and Defendant Fire Department subjected Plaintiff "to a hostile work environment because of her gender," disparate treatment because of her gender, and retaliated against her "for opposing discrimination," in violation of the NYSHRL. (Dkt. No. 23-4, ¶¶ 51–59). These Defendants argue that they are not Plaintiff's employer and therefore cannot be held liable under the NYSHRL.[9] (Dkt. No. 13-1, at 9–10; Dkt. No. 14-1, at 15–17). Plaintiff responds in a footnote that "Defendant Village is liable for the acts of its Fire Chief, Defendant Pinsky, and possibly Defendant Schmid, under the doctrine of respondeat superior." (Dkt. No. 23-5, at 8 n.1). The case Plaintiff cites for this proposition, *Cunningham v. Petrilla*, 30 A.D.3d 996, 997 (4th Dep't 2006), concerns an employee's negligence and has no bearing on a claim under the NYSHRL. *See id.* ("Under the doctrine of *respondeat superior*, an employer will be liable for the negligence of an employee committed while the employee is acting in the scope of his employment." (quoting *Lundberg v New York*, 25 N.Y.2d 467, 470 (1969))). Even if the doctrine of *respondeat superior* were available in this context, Plaintiff fails to allege a plausible NYSHRL claim against Defendants Pinsky and Schmid; therefore, the doctrine would not save her claims against Defendants Village of Manlius or Manlius Fire Department. Accordingly, Plaintiff's NYSHRL hostile work environment, discrimination, and retaliation claims against Defendant Village and Defendant Fire Department are dismissed.

---

[9] The Village and Fire Department Defendants also seek dismissal of the Title VII causes of action. The PSAC specifies, however, that Plaintiff asserts her Title VII claims solely against the Town Defendant. (Dkt. No. 23-4, ¶¶ 83–93). Accordingly, the Village and Fire Department Defendants' motion to dismiss the Title VII claims is denied as moot.

2.    **42 U.S.C. § 1983**

a.    **Fourteenth Amendment – Hostile Work Environment and Disparate Treatment**

Defendants Pinsky and Schmid argue that Plaintiff fails to allege that they were personally involved in the alleged violation of the Equal Protection Clause of the Fourteenth Amendment (hostile work environment and disparate treatment). (Dkt. No. 14-1, at 22). "An individual may be held liable under . . . § 1983 only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn*, 795 F.3d at 314 (quoting *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)). A defendant's "personal involvement" may be established by a

> showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Id*.

Even assuming Plaintiff sufficiently alleged personal involvement by Defendants Pinsky and Schmid, who were not employed by MPD, in subjecting Plaintiff to a hostile work environment and gender-based employment discrimination, her equal protection claims fail for the same reason her NYSHRL claims against them fail; Plaintiff has failed to plausibly allege that either Defendant acted with discriminatory animus. *Vega*, 801 F.3d at 86–88 (to state a Fourteenth Amendment equal protection claim, a plaintiff must "plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by

discriminatory intent'" ) (quoting *Littlejohn*, 795 F.3d at 311). Accordingly, the Fourteenth Amendment claims against Defendants Pinsky and Schmid are dismissed.

### b.    First Amendment – Retaliation

Defendants Pinsky and Schmid also argue that Plaintiff fails to allege that they were personally involved in the deprivation of her First Amendment rights. (Dkt. No. 14-1, at 22). Here, however, Plaintiff alleges that Defendants Pinsky and Schmid were personally involved in retaliating against her, in violation of the First Amendment, for obtaining an order of protection. A First Amendment retaliation claim requires allegations showing that: (1) the plaintiff's speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009).

Plaintiff's allegation that she sought and obtained an order of protection against Schmid suffices to allege that she engaged in a protected activity. "The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994); *see Jackson v. New York*, 381 F. Supp. 2d 80, 89 (N.D.N.Y. 2005) (concluding that the "plaintiff's actions in seeking enforcement of her orders of protection were protected by the First Amendment"). Plaintiff further alleges that, shortly after she obtained the order of protection, Schmid told her employer that she had threatened Manlius firefighters and failed to secure her weapon while off-duty, which led to the initiation of an internal affairs investigation by the MPD. Plaintiff also alleges that Defendant Pinsky threatened to interfere with her employment at the MPD unless she terminated the order of protection. These assertions adequately allege adverse actions as well as direct participation by Defendants Schmid and Pinsky in the alleged First Amendment

retaliation.[10] Further, the allegations that Defendant Schmid made his accusations against Plaintiff to the MPD within days of the order of protection and Defendant Pinsky tied his threats to the order of protection allow a plausible inference of a causal connection between the protected activity and the adverse action. Accordingly, the First Amendment claims against them may proceed.

### c. *Monell* Claims

Defendants Village of Manlius and Manlius Fire Department seek dismissal of Plaintiff's 42 U.S.C. § 1983 claims on the ground that Plaintiff fails to state a claim of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," and is liable only when it actually deprives, through the execution of its policies, an individual of his constitutional rights. *Monell*, 436 U.S. at 694. Official municipal policy, which "includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices so persistent and widespread as to practically have the force of law," must be "the moving force" behind the violation. *Connick v. Thompson*, 563 U.S. 51, 59 n.5, 61 (2011).

---

[10] Defendant Pinsky argues that it "is clear" that he "acted in a personal capacity with regard to the plaintiff's allegations against him." (Dkt. No. 13-1, at 8). "In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that some person acting under color of state law deprived h[er] of a federal right." *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). However, "[a] person is not automatically a state actor under Section 1983 simply because he is a government employee." *Marino v. Jonke*, 11 CV 430, 2012 WL 1871623, at *6, 2012 U.S. Dist. LEXIS 78661, at *16 (S.D.N.Y. Mar. 30, 2012). Indeed, "acts of officers in the ambit of their personal pursuits are plainly excluded." *United States v. Giordano*, 442 F.3d 30, 43 (2d Cir. 2006) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). The Second Circuit has "observed, however, 'there is no bright line test for distinguishing personal pursuits from actions taken under color of law.'" *Id.* (quoting *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994)). "A public employee may be liable under Section 1983 when he invokes the real or apparent authority of his position, or when an off-duty employee performs actions akin to his on-duty duties." *Marino*, 2012 WL 1871623, at *6, 2012 U.S. Dist. LEXIS 78661, at *18 (citing *Rivera v. La Porte*, 896 F.2d 691, 695–96 (2d Cir. 1990). As Defendants have not briefed this issue, the Court does not address it here. The Court notes that the parties have not addressed whether volunteer fire fighters are state actors with respect to the alleged conduct. *See, e.g.*, *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir. 1979).

The PSAC alleges:

> With respect to the named municipal Defendants, the actions and omissions as aforementioned constitute municipal policy since they are the actions and omissions of final policy making officials of the Town of Manlius and/or Village of Manlius. In addition, said municipal Defendants created, maintained and/or fostered a custom, policy or practice of discrimination [and retaliation] thereby causing Plaintiff injury and harm. Finally, said municipal Defendants failed to adequately train officers and supervisors on the rights of employees to be free from discrimination and retaliation.

(Dkt. No. 23-4, ¶¶ 62, 66). Plaintiff has not responded to Defendants' motion to dismiss the *Monell* claims and has only advanced arguments concerning Defendants Pinsky and Schmid. (Dkt. No. 23-5, at 9–12). As there are no plausible Fourteenth Amendment claims against Defendants Pinsky or Schmid, the only individuals who may be tied to the Village of Manlius or the Manlius Fire Department, any *Monell* claim fails as well.

Plaintiff's allegations of municipal liability against the Village of Manlius and the Manlius Fire Department for subjecting her to retaliation for exercising her right to freedom of speech, are that: shortly after the events of May 6, 2016, "firefighters had come [into a NYS Troopers station] to report that she had been acting in a threatening manner in December, 2015," and Defendant Pinsky, who was chief of the Manlius Fire Department, encouraged and directed "such reports to intimidate and threaten her." (Dkt. No. 23-4, ¶ 37). Even assuming that the conclusory allegations in the PSAC sufficiently allege that Pinsky was an official policymaker for the Manlius Fire Department and the Village of Manilus, the PSAC fails to plausibly allege that the challenged actions were within his policymaking authority. "[A] finding of general policymaking power on the part of [a public official] is not sufficient for municipal liability to attach." *Roe v. City of Waterbury*, 542 F.3d 31, 38 (2d Cir. 2008). "[T]he challenged actions must be within that official's area of policymaking authority." *Id.* at 37; *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered.*") (emphasis added); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (for municipal liability to attach, final policymaker must have "final policymaking authority *in the particular area involved*") (emphasis added). *See, e.g., Roe v. City of Waterbury*, 542 F.3d at 38 (mayor did not have "policymaking authority with respect to acts of sexual abuse he committed"). Accordingly, the *Monell* claims against Defendants Village of Manlius and Manlius Fire Department are dismissed.

### 3. Title VII

The Village and Fire Department Defendants seek dismissal of Plaintiff's Title VII claims on the ground that Plaintiff did not identify them in the charge of discrimination that she filed with the EEOC and thus failed to exhaust her administrative remedies. (Dkt. No. 14-1, at 14). As Plaintiff no longer asserts these claims against the Fire Department Defendants in the PSAC and has not otherwise opposed dismissal of these claims, they are dismissed.[11]

### 4. Compliance with New York General Municipal Law § 50-h

The Town of Manlius Defendants (both municipal and individual) contend that dismissal of Plaintiff's tort claims—intentional/reckless infliction of emotional distress, tortious interference, and prima facie tort (Eighth–Tenth Causes of Action)[12]—is required because she failed to fully comply with New York General Municipal Law § 50-h, a condition precedent to bringing tort claims against municipal defendants. (Dkt. No. 18-1, at 6). Plaintiff denies that she

---

[11] The Village of Manlius also seeks dismissal of Plaintiff's state common law claims. (Dkt. No. 13-1, at 12–19). As Plaintiff no longer asserts these claims against the Defendant Village in the PSAC and has not otherwise opposed dismissal of these claims, they are dismissed.

[12] The Town Defendants also seek dismissal of Plaintiff's defamation claim. Plaintiff, however, is no longer asserting that claim against any Town Defendant.

failed to cooperate with section 50-h's requirements but in the PSAC no longer asserts tort claims against Defendant Town of Manlius. (Dkt. No. 23-5, at 4). Thus, Defendant Town's motion to dismiss these claims is denied as moot. Plaintiff argues that the section 50-h requirements are inapplicable to her tort claims against the individual Town Defendants because the PSAC alleges that they were acting outside the scope of their employment. (Dkt. No. 23-5, at 4).

Under New York law, service of a notice of claim is a condition precedent to tort actions against municipalities. *See* N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1). In tort actions commenced against a municipal employee but not against the municipality that employs him, service of a notice of claim on the municipality is "required only if the corporation has a statutory obligation to indemnify such [employee]." *Id.* § 50-e(1)(b). A municipality must indemnify its employees for any judgment or settlement arising from acts or omissions occurring "while the employee was acting within the scope of his public employment or duties," but only if the municipality's governing body has formally agreed to indemnify its employees. N.Y. Pub. Off. Law § 18(2), (4)(a). Once a notice of claim is filed against a municipality, the municipality has "the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate." N.Y. Gen. Mun. Law § 50-h(1). Compliance with the demand for an examination is also a condition precedent to suit. *Id.* § 50-h(5) ("The action, however, may not be commenced until compliance with the demand for examination.").

The Town Defendants assert that Plaintiff, "at her attorney's direction, refused to answer several questions posed during the 50-h examination and, ultimately, walked out of a 50-h examination noticed by the Town of Manlius without completing the examination." (Dkt. No.

18-1, at 7). The Town Defendants submitted Plaintiff's notice of claim, the Town Defendant's "Notice of 50-h Examination," and the hearing transcript in support of their motion. (Dkt. Nos. 18-3, 18-4, 18-6). The Court need not consider these exhibits, however, because "[w]here, according to a plaintiff's complaint, the defendant county employees were acting outside the scope of their employment, *i.e.*, by the commission of intentional torts, the filing of a notice of claim is unnecessary." *Seale v. Madison County*, 929 F. Supp. 2d 51, 72 (N.D.N.Y. 2013); *accord* N.Y. Pub. Off. Law § 18(4)(b) ("Except as otherwise provided by law, the duty to indemnify and save harmless . . . shall not arise where the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee.").

Here, Plaintiff's claims of intentional infliction of emotional distress, tortious interference, and prima facie tort are based on alleged intentional conduct that would be well beyond the scope of employment. *See, e.g., Tulino v. City of New York*, No. 15-cv-7106, 2016 WL 2967847, at *3, 2016 U.S. Dist. LEXIS 66012, at *10 (S.D.N.Y. May 19, 2016) (denying motion to dismiss tort claim where the plaintiff's claims were "for intentional torts based on acts committed outside the scope of employment," and noting that the plaintiff's claims "for assault, battery, and defamation are premised on alleged conduct that would almost certainly be 'in violation of . . . rule[s] or regulation[s]' and beyond the scope of the individual Defendants' employment" (alterations in original)); *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 301 (S.D.N.Y. 2009) ("Because trespass and false arrest are intentional torts under New York law, plaintiff's claims, by definition, constitute 'intentional wrongdoing' that does not qualify for indemnification. Therefore, plaintiff's trespass and false arrest claims are not procedurally barred by her failure to file a Notice of Claim." (citations omitted)); *Kavazanjian v. Rice*, No. 03-cv-1923, 2008 WL 5340988, at *6, 2008 U.S. Dist. LEXIS 103881, at *20–21 (E.D.N.Y. Dec. 22,

2008) (finding that the plaintiff's state law claims were "not procedurally barred by his failure to file a Notice of Claim" because "the alleged conduct—assault and battery and *intentional infliction of emotional distress*—would, by definition, have constituted 'intentional wrongdoing'"). Thus, failure to comply with New York's notice of claim requirements under section 50-h poses no bar to Plaintiff's intentional tort claims against the individual Town Defendants. Accordingly, their motion to dismiss is denied.

### 5. Defamation

Defendant Schmid seeks dismissal of the defamation claim on the ground that the PSAC does not contain the requisite specificity concerning this claim. (Dkt. No. 14-1, at 23). To state a claim for defamation under New York law a complaint must allege: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017). *Id.* (emphasis omitted) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)). "[A] plaintiff must plead facts demonstrating falsity to prevail on a motion to dismiss" a defamation claim. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017).

According to the PSAC, on May 6, 2016, Defendant Schmid went to the MPD and "accused [Plaintiff] of threatening firefighters from Manlius back in December 2015." (Dkt. No. 23-4, ¶ 32). As to the element of falsity, Plaintiff alleges that "Defendant Schmid's accusation was false," (*id.*), and that New York State Troopers investigated the accusation "and found no evidence that the allegations were true," (*id.* ¶ 37). Plaintiff has adequately alleged that Schmid's

assertion—that she threatened firefighters—was false, and his motion to dismiss her defamation claim is denied.[13]

### 6. Intentional Infliction of Emotional Distress

In her Eighth Cause of Action, Plaintiff alleges that Defendants Schafer, Pinsky, Marlow, Gallup, Carnie, Peckins, Cushman, and Schmid subjected her to intentional or reckless infliction of emotional distress. (Dkt. No. 23-4, ¶¶ 72–75). The Court of Appeals of New York has "enumerated four elements of a cause of action for intentional infliction of emotional distress: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Chanko v. Am. Broad. Cos.*, 27 N.Y.3d 46, 56 (2016) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)). The standard is "rigorous" and "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Howell*, 81 N.Y.2d at 122).

### a. Defendants Pinsky, Schmid, Schafer, and Marlowe

The Amended Complaint alleges that, on May 6, 2016, Defendant Schmid went to the MPD, Plaintiff's place of employment, and told Defendant Schafer (a MPD captain) that Plaintiff had threatened firefighters and failed to secure her weapon in a safe at home. The MPD,

---

[13] Defendant Schmid's argument that Plaintiff must plead the defamatory statement verbatim is without merit. *See Prowley v. Hemar Ins. Corp. of Am.*, No. 05-cv-981, 2010 WL 1848222, at *6, 2010 U.S. Dist. LEXIS 45249, at *16–17 (S.D.N.Y. May 7, 2010) (explaining that "the defamation need not be pled verbatim, 'a pleading is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated'" (quoting *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 849 (S.D.N.Y. 2000))). Moreover, Defendant Schmid's reliance on *Rizzo v. Edison, Inc.*, 172 F. App'x 391, 395 (2d Cir. 2006), is unavailing as *Rizzo* involved consideration of a motion for summary judgment where the plaintiff "failed to specify the words that form the basis of her action" and the report on which she based her claim "contained no defamatory statements."

as Defendant Schafer informed Plaintiff later that day, initiated an internal affairs investigation against her based on these allegations. When Plaintiff asked Defendant Schafer why Defendant Schmid had not been arrested for violating the order of protection, which prohibited him from going to her place of employment, Schafer responded that such an arrest "would not be 'entertained'" and ordered her to turn in her weapons, keys, identification, and badge. (Dkt. No. 23-4, ¶ 33). Later that day, the Manlius Fire Chief, Defendant Pinsky, called Plaintiff and told her that, if she dropped the order of protection against Defendant Schmid, he could make the internal affairs investigation "go away," and threatened that, if she did not drop it, "he would have his firefighters report on her and . . . he would 'file' against her brother." (Dkt. No. 23-4, ¶ 34). He also sent "threatening text messages." (*Id.*). Plaintiff contacted Defendants Schafer and Marlowe and advised them that Schmid was attempting to intimidate her via the fire chief, but they declined to investigate and requested that she turn in her off duty weapon. (*Id.*). That night Defendant Schafer called Plaintiff's supervisor from her part-time job and falsely told him that Plaintiff had "resigned." (Dkt. No. 23-4, ¶ 36). Over the next few days, Plaintiff received "several phone calls from New York State (NYS) Troopers telling her "that firefighters had come in to report that she had been acting in a threatening manner in December, 2015 at the Manlius fire station;" the Troopers "investigated and found no evidence that these allegations were true." (Dkt. No. 23-4, ¶ 37).  Following these events, Plaintiff went to a hospital "for severe stress" and was sedated. (Dkt. No. 23-4, ¶ 38).

As the Town and Fire Defendants note, Plaintiff's claim is not based on a long-term campaign of harassment. However, assuming the truth of the facts alleged in the PSAC, the course of conduct Defendants Pinsky, Schmid, Schafer, and Marlowe allegedly took against Plaintiff involved the knowing disregard of the order of protection prohibiting Schmid from

approaching Plaintiff's workplace, the initiation of an investigation against her based on Schmid's allegations, the promise to make Schmid's allegations "go away" if she dropped the order of protection along with the threat to report her and to "file" against her brother if she did not, processing a "resignation" by Plaintiff when she had not resigned, and ensuing false reports about Plaintiff to the New York State Police. At this early stage of the case, the Court finds that Plaintiff has adequately alleged "extreme and outrageous conduct which cannot be tolerated in a civilized community," and adequately stated a claim for intentional infliction of emotional distress against these Defendants. *Kaminski v. United Parcel Serv.*, 120 A.D.2d 409, 412 (1st Dep't 1986); *See id.* at 410–12 (finding that the plaintiff adequately stated a claim of intentional infliction of emotional distress where he alleged that his supervisors wrongly accused him of stealing money, threatened criminal prosecution and imprisonment, subjected him to three hours of threats and intimidation, and demanded his resignation); *Stuto v. Fleishman*, 164 F.3d 820, 828 (2d Cir. 1999) (citing cases in which courts have sustained claims for intentional infliction of emotional distress, all of which "involved some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy").

### b. Defendants Gallup, Carnie, Peckins, and Cushman

Plaintiff's claim against Defendants Gallup, Carnie, Peckins, and Cushman, stems from allegations that they subjected her to sexual harassment or discrimination and does not rise to the level of "extreme and outrageous conduct." In addition, because the PSAC alleges that the incidents involving Defendant Gallup occurred in 2013, (Dkt. No. 23-4, ¶ 15), and the incident involving Defendant Carnie occurred in April 2016, (*id.* ¶ 30), both incidents are outside the one-year statute of limitations. *See* N.Y. C.P.L.R. 215(3); *Havell v. Islam*, 292 A.D.2d 210, 210 (1st

Dep't 2002) ("A claim for damages for an intentional tort, including a tort not specifically listed in CPLR 215(3), is subject to a one-year limitation period.").

Though the PSAC indicates that the conduct involving Defendants Cushman and Peckins occurred following Cushman's fall 2014 promotion, it does not provide specific dates. Even assuming these claims are timely, the allegations fail to allege a plausible claim of intentional infliction of emotional distress. *Daniels v. Health Ins. Plan of Greater N.Y.*, No. 02-cv-6054, 2005 WL 1138492, at *3, 2005 U.S. Dist. LEXIS 9036, at *9 (S.D.N.Y. May 12, 2005) (dismissing intentional infliction of emotional distress claim in employment discrimination case where the plaintiff alleged that "employees treated her "rudely and unfairly and gave her extra work to do, that her "disability" was not accommodated," and that the employer refused to promote her and "fired her for discriminatory reasons"); *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00-cv-543, 2001 WL 180055, at *2, 2001 U.S. Dist LEXIS 1670, at *6–7 (S.D.N.Y. Feb. 22, 2001) ("Plaintiff alleges that defendant was biased against her based on her race, that she was harassed and treated poorly on the job, and that she was denied the same benefits, opportunities and conditions of employment as her Hispanic co-workers until she was ultimately wrongfully terminated. Additionally, plaintiff alleges that defendant retaliated against her . . . . While the alleged behavior of which plaintiff complains may support an employment discrimination lawsuit, it is not the type of behavior that merits recovery for intentional infliction of emotional distress as established by the New York Courts.").

Here, Plaintiff alleges that Defendant Cushman made sexually offensive comments, advised other officers that Plaintiff was "trouble" and that they should disassociate from her, refused to acknowledge her, told her to find another job, hung up on her when she called with work-related questions, complained about Plaintiff going to another supervisor for an extension,

failed to provide critical backup to Plaintiff during the "pursuit of a reckless motorcyclist," and then bragged to others that he had reported a concern about the pursuit, and asked other officers to "write memos complaining about Plaintiff." (Dkt. No. 23-4, ¶¶ 22–28). Plaintiff reported this conduct to Defendant Peckins, who failed to adequately address her complaints. (*Id*.). Plaintiff alleges this conduct caused her "embarrassment, stress and anxiety." (*Id*. ¶ 23). Without more, these allegations of sexual harassment, intimidation, and retaliation are insufficient to state a plausible intentional infliction of emotional distress claim against Defendants Cushman and Peckins. *See Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) ("New York Courts are reluctant to allow [IIED] claims in employment discrimination cases . . . . Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." (quoting *Stevens v. N.Y.*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009))). Thus, the allegations of intentional infliction of emotional distress as against Defendants Cushman and Peckins are dismissed.

### 7.    Tortious Interference

Plaintiff alleges that Defendants Pinsky, Schmid, Schafer, and Marlowe "intentionally interfered with Plaintiff's employment with the Town of Manlius." (Dkt. No. 23-4, ¶ 77). Defendants argue that because this claim concerns a collective bargaining agreement, the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, preempts it. (Dkt. No. 14-1, at 26–27). Plaintiff correctly notes that because her employer, the Town of Manlius, is a political subdivision of the State of New York, the LMRA does not apply and thus does not preempt her claim. (Dkt. No. 23-5, at 17–18); *see United Bldg. & Constr. Trades Council v. City of Camden*, 465 U.S. 208, 215 (1984) ("[A] municipality is merely a political subdivision of the State from

which its authority derives."); *Malast v. Civil Serv. Emps. Ass'n, Inc.*, 474 F. App'x 829, 830 (2d Cir. 2012) (vacating and remanding district court judgment dismissing public employee's state law claims as preempted by the LMRA, explaining "Congress's explicit intention to exclude public employees like Malast from the ambit of federal regulation renders the district court's preemption holding untenable"). Accordingly, the Court turns to substance of Plaintiff's tortious interference claim.

"To state a claim in New York for tortious interference with contract, a plaintiff must allege the following elements: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Wandering Dago Inc. v. N.Y. State Off. of Gen. Servs.*, 992 F. Supp. 2d 102, 131 (N.D.N.Y. 2014) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006)). In general, the defendant must be a "stranger" to the contract. *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996).

### a.     Defendants Pinsky and Schmid

In her memorandum of law, Plaintiff asserts that "[w]ith respect to Defendants Pinsky and Schmid, the allegations are that they falsely reported information to the [MPD] and otherwise caused Plaintiff to be subjected to discipline without just cause in violation of her contractual rights." (Dkt. No. 23-5, at 16). According to the PSAC, Plaintiff is "a civil service employee and a member of the Union" and is "protected by the contract" "entered into by the Town of Manlius with its employees." (Dkt. No. 23-4, ¶ 46). According to the PSAC the contract provides that:

> "[i]n all disciplinary proceedings the officer shall be presumed innocent until proven guilty and the burden of proof on all matters

shall rest upon the Employer;" (Contract, Article XI - Grievance and Discipline Procedures, 2(c); "An officer shall not be coerced, intimidated, nor suffer any reprisals either directly or indirectly that may adversely affect his hours, wages, or working conditions as the result of the exercise of his rights under this procedure" (*Id.*, 2(d)); "Discipline shall be imposed only for incompetency or misconduct." (*Id.*, 6(a)).

(Dkt. No. 23-4, ¶ 46) (alteration in original). Plaintiff, however, fails to allege that Defendants Pinsky or Schmid had any knowledge of the above-referenced contract. Thus, the allegation that they tortiously interfered with the discipline provisions of her contract by making false allegations that led to an internal affairs investigation, fails to state a plausible claim for relief. Accordingly, the tortious interference claim as alleged against Defendants Pinsky and Schmid is dismissed.

### b. Defendants Schafer and Marlowe

The PSAC appears to advance tortious interference claims against Defendants Schafer and Marlowe based on (i) the removal of her MPD equipment following the initiation of the internal affairs investigation and (ii) the termination of her MPD employment. (*See* Dkt. No. 23-5, at 17 (arguing that "the amended complaint alleges that these Defendant subjected Plaintiff to the lose [sic] of her contractual rights through the loss of her department equipment, status, pay, and ultimately her position" (citing Dkt. No. 23-4, ¶¶ 32–46)).

Defendants Schafer and Marlowe correctly note that because they are Plaintiff's co-employees, Plaintiff must allege that they "'exceeded the bounds of [their] authority' in order to satisfy the 'third party' requirement." (Dkt. No. 18-1, at 17 (quoting *Finley*, 79 F.3d at 1295)). "Under New York law, a plaintiff who brings a tortious interference claim must allege that the defendants were not parties to the contract." *Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996). "When the claim arises in the employment context and the defendants are co-employees, the plaintiff must allege that the defendants-employees 'exceeded the bounds of [their] authority'

in order to satisfy the 'third-party' requirement." *Id.* (quoting *Finley*, 79 F.3d at 1295). "A supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest." *Id.* (citing *Murtha v. Yonkers Child Care Ass'n, Inc.*, 45 N.Y.2d 913, 915 (1978)).

### i. Loss of Equipment

The allegations that Defendant Schafer demanded Plaintiff's weapons, keys, identification, and badge after informing her that she was "now the subject of a[n] internal affairs investigation" based on Defendant Schmid's accusations (Dkt. No. 23-4, ¶¶ 32–33, 38), allow a plausible inference that Defendant Schafer interfered with her contractual right to be "presumed innocent" in all disciplinary proceedings. (Dkt. No. 23-4, ¶ 46). The PSAC, however, contains no allegations that Defendant Schafer "used 'wrongful means' or acted with malice," and thus acted outside the scope of his employment in requiring Plaintiff to return her MPD equipment. *Albert v. Loksen*, 239 F.3d 256, 276 (2d Cir. 2001). Further, to the extent Plaintiff intends to advance such a claim against Defendant Marlowe, her claim fails because there are no allegations that anyone other than Defendant Schafer asked for or collected her equipment. Accordingly, the tortious interference claims based on equipment loss are dismissed.

### ii. Termination of Employment

Although PSAC references a contract, it does not indicate whether it fixed the duration of Plaintiff's employment or whether Plaintiff was an at-will employee. In New York, "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329,

333 (1987). The Court therefore presumes the employment relationship was at will. "An at-will employee may maintain a tortious interference claim . . . in 'certain limited situations.'" *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (quoting *Finley*, 79 F.3d at 1295)). "To do so, he or she must establish that a 'third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice.'" *Id*. (quoting *Cohen*, 926 F. Supp. at 403).

The PSAC alleges that Defendant Marlowe procured Plaintiff's separation from the MPD by falsely informing the MPD that she "resigned." (Dkt. Nos. 23-4, ¶ 38). The allegation that Defendant Marlowe misrepresented to the MPD that Plaintiff had resigned, when she had not, allows a plausible inference that he acted outside the scope of his authority. *Cohen*, 926 F. Supp. at 404 ("supervisor is considered to have acted outside the scope of his employment if . . . the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or [if] ... he acted purely from malice or self-interest"). There are, however, no allegations in the PSAC that Defendant Schafer had any role in the termination of Plaintiff's employment at MPD.[14] Accordingly, the tortious interference claim against Defendant Marlowe may proceed, but is dismissed as against Defendant Schafer.

### 8. Prima Facie Tort

Plaintiff's prima facie tort claim alleges that Defendants Pinsky, Schmid, Schafer, and Marlowe "intended to inflict harm upon the pecuniary interest of the Plaintiff by engaging in the aforementioned actions and omission." (Dkt. No. 23-4, ¶ 80). Defendants argue that Plaintiff fails to state a claim because she alleges that they acted with motives other than "disinterested malevolence." (Dkt. No. 14-1, at 28; Dkt. No. 18-1, at 19).

---

[14] The PSAC alleges that Defendant Schafer called Plaintiff's "supervisor from her part-time job" and "told him that [Plaintiff] had resigned." (Dkt. No. 23-4, ¶ 36). There are no allegations, however, that Defendant Schafer communicated Plaintiff's alleged resignation to the MPD.

The elements of prima facie tort are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332 (1983)). The Second Circuit has held that "[t]he touchstone" of prima facie tort "is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (quoting *Burns*, 59 N.Y.2d at 333). "[M]otives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Id.* (quoting *Marcella v. ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir. 1985)). "In addition 'special damages must be alleged with sufficient particularity to identify actual losses and round sums without any attempt at itemization are insufficient.'" *Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 277 (E.D.N.Y. 2009) (quoting *Discover Group v. Lexmark Int'l, Inc.*, 333 F. Supp. 2d 78, 87 (E.D.N.Y. 2004)).

According to the PSAC, Defendant Pinsky attempted to "intimidate Plaintiff into dropping the order of protection against Benjamin Schmid, as they are friends," (Dkt. No. 23-4, ¶ 34), and Defendant Schmid made "complaints to Plaintiff's employer in an attempt to coerce Plaintiff to meet with him and/or continue the relationship," (*id.* ¶ 31). Because Plaintiff's claims against Defendants Pinsky and Schmid comprise her defamation and intentional infliction of emotional distress claims, they are subject to dismissal. *See Gallagher v. N.Y.C. Health & Hosps. Corp.*, No. 16-cv-4389, 2017 WL 4326042, at *6, 2017 U.S. Dist. LEXIS 155259, at *22 (S.D.N.Y. Sept. 20, 2017) (granting motion to dismiss where "Plaintiffs fail to plead any facts to support a claim for prima facie tort" and instead "improperly reassert the same allegations of

misconduct and general harm that form the basis of their other causes of action"), *aff'd*, No. 17-cv-2942, 2018 WL 2049114, 2018 U.S. App. LEXIS 11277 (2d Cir. May 2, 2018).

Plaintiff's allegations against Defendants Schafer and Marlowe are slightly different; Plaintiff alleges that, on June 17, 2016, she submitted a claim for workers compensation benefits and benefits under New York General Municipal Law § 207-c, "to which she is entitled as her injury is work related," and that Defendant Marlowe "failed to process or provide" these benefits. (Dkt. No. 23-4, ¶ 38). Plaintiff argues that these allegations "adequately plead[] a *prima facie* tort claim." (Dkt. No. 23-5, at 19).

As an initial matter, the Court notes that there are no allegations that Defendant Schafer was involved in processing Plaintiff's claim for workers compensation benefits. Thus, the PSAC fails to state a prima facie tort claim against Defendant Schafer.[15]

Defendant Marlowe argues that Plaintiff failed to allege that he "acted solely with malice towards the plaintiff." (Dkt. No. 26-2, at 17). Indeed, the PSAC is replete with allegations that Defendants "subjected women to retaliation and discriminatory and disparate treatment," subjected "females of higher standards of performance and adherence to rules and regulations while excusing men from the same standards," and "participated in and maintained a long standing practice, custom and policy of discrimination against women." (Dkt. No. 23-4, ¶¶ 39-40, 47). Even assuming, however, that Plaintiff sufficiently alleges that Defendant Marlowe acted with disinterested malevolence with respect to her workers' compensation claim, the PSAC fails to adequately allege special damages.

---

[15] Moreover, to the extent allegations against Defendant Schafer are the allegations that support the intentional infliction of emotional distress and other tort claims, they fail to state a plausible prima facie tort claim. *See Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 347 (S.D.N.Y. 2000) ("[I]t is well settled that any claim that is covered by a traditional tort cannot be the basis for a claim of prima facie tort—even if the traditional tort claims turn out not to be viable." (citing *Gertler v. Goodgold*, 107 A.D.2d 481 (1st Dep't 1985))).

The PSAC alleges that Plaintiff's pay "was suspended shortly after she went out on medical leave" in May 2016, and that she consequently lost wages and benefits, which continued following Defendant Marlowe's alleged refusal to process her workers compensation claim. While this allegation alludes to economic damages, it falls well short of the particularity requirement. *See McKenzie v. Dow Jones & Co.*, No. 08-cv-3623, 2008 WL 2856337, at *4, 2008 U.S. Dist. LEXIS 55387, at *16 (S.D.N.Y. July 22, 2008) (granting motion to dismiss finding that the plaintiff's damage allegation, which consisted "'entirely of round figures and lump sums, without any explanation of how plaintiff arrived at such figures' to be insufficient to satisfy" the special damages element of "a prima facie tort under New York law" (quoting *Solar Travel Corp. v. Nachtomi*, No. 00-cv-3564, 2001 WL 641151, at *9, 2001 U.S. Dist. LEXIS 7549, at *32 (S.D.N.Y. June 8, 2001))). Accordingly, the prima facie tort claim is dismissed.

### C.      Cross-Claims

The Fire Department Defendants move to dismiss (Dkt. Nos. 14, 22) the cross-claims for indemnification and contribution asserted by the Town Defendants and Defendant Marlowe on the ground that they have "not breached any duty owed to Plaintiff" and therefore "no basis exists whereby the Town Police Department Defendants could recover against the Fire Department Defendants for their alleged liabilities in this action." (Dkt. No. 14-1, at 29–30). The Fire Department Defendants also requests that "the Court use its discretion in determining if sanctions against the Town Police Department Defendants are appropriate under Rule 11(b) of the Federal Rules of Civil Procedure. (Dkt. No. 14-1, at 30). The Town Defendants oppose dismissal of the cross-claims, but advance no legal support for their request that the motion to dismiss the cross-claims be denied. (Dkt. No. 26-2, at 19). They contend, however, that sanctions are not warranted because the cross-claims "are standard common law cross-claims that were

included simply to preserve apportionment of damages if a jury were to find liability on the part of more than one defendant, especially with respect to the plaintiff's tort claims." (Dkt. No. 26-2, at 19).

An action for contribution may be maintained between concurrent, successive, independent, alternative, and even intentional tort-feasors, who have caused the 'same injury' to plaintiff." *Castro v. County of Nassau*, 739 F. Supp. 2d 153, 184 (E.D.N.Y. 2010) (quoting *LNC Invs., Inc. v. First Fidelity Bank, Nat'l Ass'n*, 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996)). Here, the only state law claim surviving against the Fire Department Defendants is the intentional infliction of emotional distress claim. The same claim also remains against Town Defendants Schafer and Marlowe. As potential joint tortfeasors, the contribution claim may proceed against the Fire Department Defendants.

"Unlike contribution, '[i]ndemnity . . . flows from either a contractual or other relationship between the actual wrongdoer and another, such as that of employee and employer, and involves a complete shifting of the loss.'" *Castro*, 739 F. Supp. 2d at 184 (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 306 (1979)). Here, the cross-claim contains no allegation of a relationship or duty between the Town Defendants and Fire Department Defendants. Accordingly, the Fire Department Defendants' motion to dismiss the cross-claim for indemnification is granted. Sanctions are denied.

## VI.     AMENDMENT OF DISMISSED CLAIMS

In light of the Court's ruling and analysis, it is doubtful that Plaintiff could plausibly replead many of the claims ordered dismissed.  Nevertheless, on this record, the Court cannot say amendment would be futile as to Plaintiff's NYSHRL claims against Defendants Pinsky and Schmid, *Monell* claims against the Village and Fire Department, intentional infliction of

emotional distress claims against Defendants Cushman and Peckins, tortious interference claim against Defendants Pinsky, Schmid, and Schafer, and prima facie tort claim. The Court therefore will allow Plaintiff to file an amended complaint as to these claims. Plaintiff should revise the PSAC in accordance with the guidance provided in this Memorandum-Decision and Order. Any amended complaint must be filed by August 31, 2018.

## VII. CONCLUSION

For these reasons, it is

**ORDERED** that Defendant Pinsky's motion to dismiss (Dkt. No. 14) under Rule 12(b)(5) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that if Plaintiff does not, within 14 days of the date of this order, effectuate service on Defendant Pinsky and file a certificate of service, the Clerk of the Court shall **DISMISS** Defendant Pinsky from this action without further order; and it is further

**ORDERED** that the Fire Department Defendants' motion to dismiss (Dkt. No. 14) under Rule 12(b)(6) is **GRANTED in part** as follows: Plaintiff's NYSHRL, Fourteenth Amendment, *Monell*, Title VII, and Tortious Interference claims **are DISMISSED without prejudice**; and the Manlius Fire Department is **DISMISSED** as a defendant in this action; and it is further

**ORDERED** that the Fire Department Defendants' motions to dismiss (Dkt. Nos. 14, 22) the Town Defendants' cross-claim for indemnification are **GRANTED** and the cross-claim for indemnification is **DISMISSED without prejudice**; and it is further

**ORDERED** that the Fire Department Defendants' motions to dismiss (Dkt. Nos. 14) are otherwise **DENIED**; and it is further

**ORDERED** that the Village Defendant's motion to dismiss (Dkt. No. 13) is **GRANTED** and the Village of Manlius is **DISMISSED** as a defendant in this action; and it is further

**ORDERED** that the Town Defendants' motion to dismiss (Dkt. No. 18) under Rule 12(c) the intentional infliction of emotional distress claim against Defendants Gallup, Carnie, Peckins, and Cushman and the prima facie tort claim is **GRANTED**; and it is further

**ORDERED** that the Town Defendants' motion to dismiss (Dkt. No. 18) is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff's cross-motion to amend the complaint (Dkt. No. 23) is **GRANTED** and Plaintiff is directed to revise the PSAC in accordance with the guidance provided in this Memorandum-Decision and Order and file a Second Amended Complaint by August 31, 2018.

**IT IS SO ORDERED.**

August 8, 2018

Brenda K. Sannes
U.S. District Judge